# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-1992-CMA-KMT

SILVANA PAJOR FLORES

    Plaintiff,

v.

AMERICAN INCOME LIFE INSURANCE COMPANY &
XAVIER INC.

    Defendants,

## DECLARATION OF RICHARD CORREA

Richard Correa states as follows:

1. I am over the age of 21 and have personal knowledge of the matters set forth in this Declaration, and I am competent to testify thereto.

2. I am the president and founder of Xavier, Inc. Xavier, Inc. is a Colorado corporation in the business of providing support services to my business as a State General Agent (SGA) for American Income Life Insurance Company ("AIL"). The employees of Xavier, Inc. consist of an administrative assistant, what we call conservationists, and receptionists. The duties of Xavier, Inc. employees include provision of and receipt of records and information with AIL, responding to inquiries from existing and potential policyholders and general customer service. The conservationists work to keep clients satisfied, thereby "conserving" their business. Xavier, Inc. does not and never has employed sales people, and does

not sell insurance: from its office, via direct marketing, through the internet or otherwise. Xavier, Inc. has no contractual or other business relationship with AIL.

3. As an individual, I am the SGA for Colorado and Texas for AIL, pursuant to a written contract dated December 29, 2011. A copy of my contract is attached to AIL's Motion as Ex. D. I began my career in life insurance with AIL in 2002 as an Agent/Trainee, and worked my way up to Managing General Agent ("MGA") by the time I left in 2004. After working for another life insurance company, I returned to the Colorado agency in 2006, but was required to start as a Supervising Agent, two levels below my position when I left. When I first became an agent in 2002, I had only a high school education and no specialized training. I worked very hard and quickly moved up to positions of Supervising Agent, General Agent ("GA"), Managing General Agent and Regional General Agent ("RGA"), before being named State General Agent. In each of these positions, I was engaged as an independent contractor by AIL pursuant to separate but very similar written agreements. My agreements were the same or very similar to the independent contractor agreements Plaintiff signed with AIL for her positions of Agent, Supervising Agent and General Agent, and the independent contractor agreements signed by all agents at every level of the organization.

4. At no time did Xavier, Inc. enter into an employment relationship with any of the agents affiliated with me or my agency. Moreover, Xavier, Inc. has never entered into any agreements, including employment or independent contractor agreements, with anyone to sell insurance products.

2

5. Xavier, Inc. provides no training or field supervision to agents, nor does it dictate what products they must sell. Xavier, Inc. conducts no mandatory meetings with agents, set work hours or supervise their work.

6. Xavier, Inc. does not provide training for agents planning to take the state examination.

7. Xavier, Inc. provides no reimbursement of business expenses incurred by agents.

8. Xavier, Inc. provides no paid health insurance, vacation, sick days, holidays, retirement or worker's compensation benefits to agents. However, Xavier, Inc. does provide employee benefits to its employees.

9. Xavier, Inc. does not pay commissions to or otherwise compensate agents for their sales.

10. Plaintiff's General Agent Agreement with AIL provides for termination. The "Termination" section on the third page states that either AIL or Plaintiff can terminate the Agreement for cause, and also without cause upon 30 days' notice. In addition, the provision also states that the Agreement "will automatically terminate" if the State General Agent "terminates its relationship with the "General Agent at any time." (Similar provisions are found in all Agent Agreements, including mine)  To this day, I have not terminated Plaintiff's relationship with my agency. In addition, I have only terminated my relationship with one agent in the past, and that decision was occasioned by the agent's misconduct.  As the SGA, I have no incentive to terminate my relationship with agents, absent misconduct, as I receive a commission on their sales.

3

11.     Throughout Plaintiff's tenure with my agency, she worked with and interacted with other more experienced AIL agents. These agents were Supervising Agents, General Agents, Managing General Agents and Regional Managing Agents. She also worked with agents on her own level, and, after she became an SA and GA, agent/trainees who she herself recruited.

12.     At no time while Plaintiff was affiliated with my agency did she complain or even inform me, directly or indirectly, that anyone affiliated with my agency, or otherwise, made ethnic, racial, sexual or other inappropriate statements directed at her or in her presence. I at no time overheard any statements or words of the nature she alleges. As a Mexican who was raised in Denver in a Spanish-speaking family, I would have immediately and forcibly reacted to such behavior, or a report of such behavior.

13.     Plaintiff suggests that she was somehow forced to work out of my Colorado Springs office beginning in early January, 2015. The truth is that she, along with Tyler Storie and Peter Van der Huizenwest ("Peter West") requested this assignment. In response to my letting my MGAs know of the need for agents in Colorado Springs, Plaintiff, Storie, West and their RGA, Andrew McQuade came to me in late 2014 and specifically requested this assignment. It is important to note several things about this. I have no incentive to send any agent to a location they do not want to go, as history shows they are unlikely to perform well there. Also, agents are always able to continue their existing businesses in other locations. These agents certainly did that. They were only one hour away from Denver, so there would be no effect on their overall business, other than leads they would leave behind in Kansas, where two of them had been working part-time. They had to relinquish the leads that had not yet

4

worked, because they would no longer be working Kansas. Of course, they were given more leads when they went to the Colorado Springs office.

14. During the late 2014 meeting with Plaintiff, Storie, West and McQuade, Plaintiff expressed no reluctance to work with, or any lack of comfort with, Storie, West or McQuade. She expressed enthusiasm for the new responsibilities, as did the others.

15. I purchase client leads from AIL, and I own them. I share them with agents who demonstrate the commitment to be successful in this business. The assignment of leads is done randomly within the zip code requested by the agent, via a computer program. No one including me knows which leads will result in sales, which is dependent on many factors, including the skill and diligence of the agent.

16. Plaintiff claims she was discriminated against based on Tyler Storie's promotion to an SA contract faster than she was promoted. Numerous factors other than sales production go into such a decision, including potential for leadership, professionalism, retention of policies, dependability and the then existing circumstances of the agency. The fact is that all the factors were considered in these decisions, which I made as State General Agent for purely business reasons. Again, my motivation is to move agents up as soon as they are ready, as they will hopefully expand the business to my benefit.

17. Storie started as an agent in April, 2013, and Plaintiff started 5 months later in September, 2013. From a purely statistical standpoint, Storie had better 3 month sales when he was moved to SA in July 2013 than Plaintiff had at her 3 month point. Her production and other factors improved and she was moved to an SA contract 2 months later.

18. However, Plaintiff's next move, to GA, occurred much faster than Storie's. Storie worked 15 months as an SA before he was moved up, while Plaintiff was promoted to GA status in only 9 months. From their original start date, Storie worked 18 months before reaching the GA level, while Plaintiff made it in 14 months.

19. Occasionally, potential agents recruited by an SA or above are reassigned to other SAs and above. This occurred in January 2015 with Plaintiff and Storie, Because they had to be physically present on a regular basis to train the agents they recruited, they had to give up their recruits and take over recruits in Colorado Springs, as well as build up their group of new recruits. Reassignment can also occur in the early stage of launching or re-staffing an office, where the workloads need to be balanced. That also likely affected what occurred in Colorado Springs in January 2015.

20. It is my understanding that Plaintiff terminated her work as an AIL General Agent in February, 2015, to the surprise of others working there. She notified McQuade and possibly West by telephone only, stating that she was no longer coming in, or words to that effect. She at no time notified me or anyone at Xavier that she was leaving.

I affirm under the penalties of perjury that the foregoing is true and correct. Executed on the 24 day of May, 2017.

_____
Richard Correa

6