IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:16-CV-01992-CMA-KMT</u>

Silvana Pajor Flores

       Plaintiff,

v.

American Income Life Insurance Company and
Xavier Inc.

       Defendants,

---

**Plaintiff's Response to Defendant Xavier Inc.'s Motion for Summary Judgment**

---

COMES NOW, Plaintiff, Silvana Pajor Flores, by and through her counsel, Attorney Maria Ruskiewicz, respectfully submits this response stating there is a genuine issue of material fact and Defendant is not entitled to judgment as a matter of law:

## <u>Issue & Conclusion</u>

The issue is whether Plaintiff Silvana Pajor Flores was a statutory employee of American Income Life "AIL" through Xavier, Inc. and Richard Correa. Based upon either the IRS 20 factor test or the hybrid test Silvana Pajor Flores is a statutory employee either directly, through both Richard Correa and Xavier Inc..

## <u>Facts</u>

All prior filing by Plaintiff are incorporated herein.

1

1) **Amount of Training**

   a) AIL holds national training seminars provide by AIL and paid by AIL.  Ex. 16 Page 139 ¶2-7

   b) AIL has an Agency Resource Center for training videos, questions and answers and how to guides. Ex. 17 Page 132 ¶1-15

   c) AIL must approve all written documents, such as scripts and homework for training mandated by either Richard Correa or Xavier Inc. Ex. 16 Page 80 ¶2-14, Page 81 ¶1-6

2) **Degree of business integration**

   a) Section 1 applies.

   b) Richard Correa and Xavier Inc. confirm in throughout its deposition that "we" means AIL and Richard Correa and Xavier Inc.. Ex. 17 Page 105 ¶7-12

   c) AIL has a PR and media group. Ex. 17 Page 103 ¶21-24; Ex. 16 Page 1955 ¶3-10

   d) AIL markets resumes and recruits on third party platforms, such as Monster and CareerBuilder for employees, such as Richard Correa and Xavier Inc. through Torchmark Recruiting Management System Ex. 17 Page 80 ¶8, Page 126 ¶18-19

   e) AIL provides Spotlight magazine for agent recognition. Ex. 16 Page 6 ¶19, Page 103 ¶8-17

   f) AIL provide, maintain and control and agent set up kit that provides assigned numbers and reports provided to Richard Correa and Xavier Inc.. Ex. 16 Page 6 ¶15-20

g) Contracts are controlled, maintained and executed only by AIL irrelevant of Richard Correa or Xavier Inc.. Ex. 16 Page 8 ¶8-12, Page 9 ¶9-10, Page 38 ¶4-11, Page 41 ¶14-25

h) AIL's contract shows Richard Correa in the hierarchy but this is the contract with the company [AIL]. Ex. 16 Page 42 ¶1-8

i) AIL confirms that Richard Correa as a SGA is in a hierarchy and not independent and would have no knowledge of an executed contract. Ex. 16 Page 42 ¶1-8, Page 44 ¶1-7.

j) Richard Correa stated under notary that Xavier Inc. is a dba AIL. Ex. 17 ¶2.

k) Prior agents of AIL have not heard of Xavier Inc., such as Daniel Pitman and Jesus Navarro. Ex. 2 ¶15-22; Ex. 3 ¶ 6-9.

l) AIL had not heard of Xavier Inc. until filing of Plaintiff's complaint Ex. 16 Page 12 ¶2.

m) Richard Correa signs emails as American Income Life of Colorado. Ex. 17 Page 9 ¶2-3; Ex. 5

n) AIL has a mainframe system that is owned, operated, controlled and available to AIL corporate that agent information is saved, such as licenses and application.  In the event of an errors or omissions Richard Correa and Xavier Inc. must request these documents from AIL. Ex. 16 Page 9 ¶11-17.

o) AIL possesses all the records that Richard Correa and Xavier Inc. use for AIL. Ex. 17 Page 34 ¶3-5

p) AIL contracts with individuals and no companies, such as Xavier Inc. or brokers. Ex. 16 Page 10 ¶20-22, Page 11 ¶1-3; Ex. 17 Page 32 ¶18-24

q) Richard Correa has only one contract with AIL. Ex. 17 Page 33 ¶6-8

r) AIL defines boundaries that an agent can sell in at a high executive level. Ex. 16 Page 14 ¶15-17.

s) AIL generates leads through different avenues including but not limited to approaching unions, credit associations and other organizations that might be paid for. Ex. 16 Page 15 ¶19-24.

t) SGA contract states that he is responsible for recruitment and recommendation to the Company for producers (agents). AIL having the final say. Ex. 8 ¶O.

u) AIL requires agent qualifiers. Ex. 4.

v) Union is not a union but an optional employee organization that does not affect an agent if chosen to not join.

w) All scripts are approved by AIL used by Richard Correa and Xavier Inc.. Ex. 17 Page 37 ¶4-9; Ex. 16 Page

x) Richard Correa's business location has AIL on it, in it, on the doors, and on the walls.  Nowhere is there Xavier Inc. advertised.

y) Richard Correa's Texas location is just an office that is listed as AIL or Torchmark headquarters. Ex. 11

z) Richard Correa's office in Texas lists all the factors of AIL that are in no way accurate to only him or Xavier Inc.. Ex. 12

aa) Child safety kits are supplied and returned to AIL for direct marketing as leads with pre-addressed and stamped cards.  Ex. 16 Page 34 ¶18-24

bb) AIL does not allow agent-employee to keep any leads or clients after termination, including those solicited outside of AIL's membership group solely by the agent.

cc) AIL deemed higher commission rates and title changes for agents as promotions. Ex. 16 Page 45.

dd) AIL sends letters directly to agents for congratulations on your promotion. Ex. 16 Page 45 ¶17

ee) AIL approves all written documents used by any agent including SGAs. used in training, such as phone scripts, child safety scripts, business cards, online advertising and scripts. Ex. 5.

ff) Plaintiff's business card states she was a General Manager and hiring manager with AIL's logo as confirmed by Richard Correa and Xavier Inc.. Ex. 17 Page 107 ¶18-21

gg) AIL created, owns, controls and maintains a program called the E-app. This is where agents and Plaintiff would log in to generate reports, track time, track leads, track calls, and maintain information. Ex. 16 Page 22 ¶8-10, Page 24 ¶1-3

hh) AIL sends leads to one state general agent based on where those leads are from. Ex. 16 Page 22 ¶22-24

ii) Torchmark Corporation is cross advertised with AIL. Ex. 16 Page 27 ¶17-24

jj) AIL owns, maintains and control a system called the mainframe.  This system is where agents and Plaintiff's contracts, license, codes, number assigned and other information are stored.   This is not available outside the main office to SGAs, Richard Correa, Plaintiff or Xavier Inc.. Ex. 16 Page 40 ¶1-8, Page 48

kk) Richard Correa and Xavier Inc. are recorded at a training session teaching scripts and agents to state they are with AIL and Torchmark Corporation. Ex. 17 Page 45 ¶22-24

ll) Richard Correa and Xavier Inc. are recorded at a training session scripting a recruit that AIL or Torchmark Company is who it is calling for and there are no cold calls because of existing accounts. Ex. 17 Page 48

mm)   AIL supplies a confidential questionnaire to all departed agents, including

from Richard Correa and Xavier Inc. that ask questions such as "why did you leave

American Income, Dissatisfied with my State General Agent and/or Managements,

was not provided with sufficient leads, did not feel there was a chance for

advancement, give a brief description of the steps your field trainer used to prepare

you . . , were you trained to make 6 appointments, did your manager reviewed with

you your weekly advance report and monthly AP&P report". . . Ex. 17 Pages 82-85

nn) AIL pulls leads from an agent, such as Plaintiff, thorough the e-app when the lead is

not closed within 2 weeks, this includes solicited leads from the agent solely. Ex. 17

Page 133 ¶16-19

oo) AIL dictates what can be seen by Richard Correa, Xavier Inc., and Plaintiff on the e-

app. Ex. 17 Page 136 ¶1-4

pp) Richard Correa and Xavier Inc. on behalf of AIL submitted agent licenses to Texas

State. Ex. 15

3) **Extent of personal services**

a) AIL direct agents to offer their members at no cost benefit and deliver those

certificates. Ex. 16 Page 15-16 ¶24-2

b) AIL directs agents to deliver child safety kits to promote its business. Ex. 16 Page 24

¶17-24

c) AIL directed Plaintiff to work on other agent's clients for no payment or commission.

Ex. 5

d) AIL defines boundaries "territories" limiting areas of sales from a high executive level

for agents and Plaintiff to prevent competition between agents. Ex. 16 Page 14 ¶15-

19; Ex. 17 Page 80 ¶14-19

e) AIL directly markets leads and sends those leads to one state general agent based on where those leads are at. Ex. 16 Page 22 ¶22-25

f) AIL directs all lower positions below an agent to be contracted by AIL with the minimum standards required, such as sales.

**4) Control of assistants**

a) AIL corporate office controls who is hired, who can supervise and how to supervise.

b) AIL is the sole payor of all agents-employees.

**5) Continuity of relationship**

a) AIL pays vested and persistency commissions beyond termination, a form of retirement.

b) AIL contracts that the SGA cannot sell other life or health insurance, contract or receive approval organizations, mailings to such organization or soliciting organizations a year after termination and forever for policy holders. Ex. 8 Page 2.

**6) Flexibility of schedule**

a) Agents hours and days of work are dictated by AIL.

**7) Demands for full-time work**

a) AIL offers part and full time work.  The full-time work is contracted. AIL hired Plaintiff full time. Ex.

**8) Need for on-site services-Investment in facilities-Provision of tools and materials**

a) AIL's e-app was necessary for on-site services and product direction.

b) AIL provided a place to work with tables, chairs, meeting rooms, training, meetings, computers and printers.

c) AIL provides e-app, paper, logos, printer, work space, tables, chairs, meeting rooms, computers. Ex. 17 Page 128 ¶13-17

9) **Sequence of work**

   a) AIL requires work to be performed in a specific order or sequence through its mandatory e-app program.

10) **Requirements for reports**

   a) AIL regularly provided mandated reports written and oral on the status of a project.

   b) AIL tracked and mandated minimum requirements for agent recruitments.

   c) AIL generated Plaintiff's progress and persistency with AP&P Reports.  These reports were populated monthly and discussed by Richard Correa and Xavier Inc. when necessary to Plaintiff and agents for losing business. Ex. 17 Page 116 ¶11-23

   d) Advance reports tracked by the e-app are timed and reviewed by AIL.  If AIL deems an agent's persistency below company average, that report is advanced to the SGA for review with agent.  After a second subpar report, the agent is terminated. The e-app is only available to the SGA, Richard Correa and Xavier, Inc. for 18 months as controlled by AIL. Ex. 16 Page 55 ¶1-6

   e) AIL reports tracked time spent from opening to closing, averages of agents for closings, persistency.

   f) AIL's exit questionnaire asked did your manager reviewed with you your weekly advance report and monthly AP&P report" . . . Ex. 17 Pages 82-85

   g) Ail generates and reports weekly an underwriting bulletin to Richard Correa and Xavier Inc. to discuss with individual agents what needs to be done to get a policy finished.  Ex. 17 Page 99 ¶19-25

   h) AIL's e-app review cannot be viewed by agents.  Ex. 17 Page 130 ¶2-4

   i) AIL has reports such as agent reports, financial reports, residual reports for agents that Richard Correa and Xavier Inc. can only view for a year.

j)  AIL has a sales duration report on each agent as to the time for sale duration, presentation duration, pre-survey presentation, initial offer duration, initial offer presentation, final offer and times to close on the e-app that is mandatorily used in the field.  This report calculates the agent's average time on each topic to ensure efficiency.

**11) Method of Payment**

a)  AIL paid guaranteed advances, advances and other forms of payment that are not commission based.

b)  AIL is the sole company who pays all agents and Plaintiff.

c)  AIL has numerous types of payments, weekly pay, bonus, advances, World's Greatest Bonus, tiered bonus, tiered pay, Guaranteed advance for the first 90 days (not commission), tenure bonus, million-dollar club, president's club, founder's club Ex. 1 and 10.

**d)**  Richard Correa and Xavier Inc. confirm through a voice recording at a training session that it would recruit agents by stating that AIL offers non-commissioned pay structures.  "It's not 100 percent commission" Ex. 17 Page 39 ¶8-14, Page 49 ¶19-21

e)  Advance pay is a loan against future anticipated commission.   Also, called pre-paid commission.   This is not commission.  Ex. 16 Page 17 ¶19-24

f)  AIL offers residual payments that Richard Correa and Xavier Inc. confirm are not commissions. Ex. 17 Page 52 ¶5-18

g) The agent is responsible to AIL for any advance pay that is not actually commissioned by a sale but debited to the agent as advanced, this doesn't include guaranteed advance. Ex. 16 Page 18 ¶3-9

h) This debt could have interest. Ex. 16 Page 18 ¶14

12) **Payment of business or travel expenses.**

a) AIL pays for accommodations for agents to attend conferences for training.

b) Plaintiff was not allowed to increase the flat rates provided by AIL for policies to cover any costs incurred.

13) **Provision of tools and materials**

14) **Investments in facilities**

a) AIL facilities are listed on its

15) **Realization of profit and or loss**

a) Employees (Agents) are given option to purchase stock in the parent company Torchmark corporation.  Therefore, if an employee makes AIL profit, the employee will profit too.

b) AIL provided guaranteed advances and a predetermined pay structure to minimize Plaintiff's significant profit or loss.

16) **Work for multiple companies**

a) Employees (Agents) are not allowed to work for other companies.  The contract can state Torchmark affiliates but AIL confirmed that a contracted agent with AIL.

b) AIL is a captive company of Torchmark Corporation and related.

c) AIL only offers AIL products. Ex. 16 Page 30 ¶10-11

d) Richard Correa and Xavier Inc. solely sold AIL products at all locations. Ex 17 Page 11 ¶1-2, Page 14 ¶21-24

e)  AIL's contract with Richard Correa states that he will exclusively sell AIL products.

Ex. 17 Page 31 ¶18-23

17) **Availability to public**

a)  AIL directly markets members.  Members include unions, credit associations and other organizations approached by AIL and possibly paid by AIL for leads.  AIL does not market to the public and employees (agents) are not advanced paid for non-member sales, unlike member sales provided by AIL. Ex. 16 Page 23 ¶10-24, Page 25 ¶6-10, ¶20-25, Page 26 ¶1-9

b)  SGAs are advertised as one and the same as AIL.  There is no reference to an agency or Xavier Inc. or independent contractor Ex. 6

c)  AIL does not directly market services to the public.

d)  The public would have no knowledge of Xavier Inc. or Richard Correa Agency or any independency since they had no agency license or advertised as such. Ex. 17 Page 15 ¶3-5, ¶13-14, Page 18 ¶13-19, Page 20 ¶23-25.

e)  Against what Xavier Inc.'s and Richard Correa's deposition Xavier Inc. is not registered with Texas Secretary of State to a Richard Correa in the TX data base. Ex. 17 Page 20 ¶20-23; Ex. 9

f)  No agency, such as Xavier Inc., is registered with the Department of Regulatory Agencies Ex. 17 Page 24 ¶14-17, Page 25 ¶17-25

18) **Right or manner or control of Termination**

a)  Plaintiff and Richard Correa could not unilaterally terminate their work for AIL without liability.

b)  Richard Correa and Xavier Inc. could terminate on behalf of AIL and this was stated during a training class for not having strong business. Ex. 17 Page 117 ¶1-9

19) **Direction of Supervisor**

    **a)** AIL has mangers and supervising agents. Ex. 16 Page 28 ¶22-25

    **b)** AIL has directors that assist SGAs. Ex. 16 Page 30 ¶12-14

    **c)** AIL has hiring managers that forward resumes to call to Richard Correa and Xavier Inc.. Ex. 17 Page 46 ¶8-12

    **d)** Richard Correa and Xavier Inc. hold mandatory managers' meetings. Ex. 17 Page 58 ¶17-18

    **e)** Richard Correa and Xavier Inc. are recorded stating there is a minimum standard of 30 referrals, and 500 ALPs. Ex. 17 Page 71 ¶3-4, Page 77 ¶17-19

    **f)** Richard Correa and Xavier Inc. confirm classes and meetings. Ex. 17 Page 78 ¶15-19

    **g)** Richard Correa and Xavier Inc. confirm certain set call days, recruiting dates and work hours. Ex. 17 Page 79 ¶12-17, 19-25

    h) Richard Correa and Xavier Inc. confirm that agents had approached him about feeling as an employee and not an independent contractor. Ex. 17 Page 124 ¶8-16

20) **Special Skill required**

    a) There is no special skill required.  Only the passing of a basic producer test.

21) **Whether the work is an integral part of the business**

    a) Without the agent's work and Plaintiffs, there would be no profit for AIL.

22) **Worker accumulates retirement benefits**

    a) AIL offers vested payment plans as a form of retirement.

23) **Taxes**

    a) Richard Correa and Xavier Inc. did not file taxes in Texas.  Ex. 17 Page 21 ¶1-6

    b) Richard Correa and Xavier Inc. filed taxes as a dba of AIL. Ex. 17 Page 125 ¶5-12

c) Richard Correa and Xavier Inc. filed as a percentage holder. Ex. 7. The other percentage holder is withheld.

24) **Intention of the parties**

a) AIL intended the parties to have an employer employee relationship. Plaintiff intended to be an employee immediately after being hired based upon the daily actions and control as discussed above.

## Laws

IRS-International Revenue Service state defines a statutory employee A full-time life insurance agent whose principal business activity is selling life insurance and/or annuity contracts for one life insurance company;

IRS looks at 20 factors used to evaluate right to control and the validity of independent contractor classifications include:

• **Level of instruction**. If the company directs when, where, and how work is done, this control indicates a possible employment relationship.

• **Amount of training**. Requesting workers to undergo company-provided training suggests an employment relationship since the company is directing the methods by which work is accomplished.

• **Degree of business integration**. Workers whose services are integrated into business operations or significantly affect business success are likely to be considered employees.

• **Extent of personal services**. Companies that insist on a particular person performing the work assert a degree of control that suggests an employment relationship. In contrast, independent contractors typically are free to assign work to anyone.

• **Control of assistants**. If a company hires, supervises, and pays a worker's assistants, this control indicates a possible employment relationship. If the worker retains control over hiring, supervising, and paying helpers, this arrangement suggests an independent contractor relationship.

• **Continuity of relationship**. A continuous relationship between a company and a worker indicates a possible employment relationship. However, an independent

contractor arrangement can involve an ongoing relationship for multiple, sequential projects.

• **Flexibility of schedule**. People whose hours or days of work are dictated by a company are apt to qualify as its employees.

• **Demands for full-time work**. Full-time work gives a company control over most of a person's time, which supports a finding of an employment relationship.

• **Need for on-site services**. Requiring someone to work on company premises—particularly if the work can be performed elsewhere—indicates a possible employment relationship.

• **Sequence of work**. If a company requires work to be performed in specific order or sequence, this control suggests an employment relationship.

• **Requirements for reports**. If a worker regularly must provide written or oral reports on the status of a project, this arrangement indicates a possible employment relationship.

• **Method of payment**. Hourly, weekly, or monthly pay schedules are characteristic of employment relationships, unless the payments simply are a convenient way of

distributing a lump-sum fee. Payment on commission or project completion is more characteristic of independent contractor relationships.

• **Payment of business or travel expenses**. Independent contractors typically bear the cost of travel or business expenses, and most contractors set their fees high enough to cover these costs. Direct reimbursement of travel and other business costs by a company suggests an employment relationship.

• **Provision of tools and materials**. Workers who perform most of their work using

company-provided equipment, tools, and materials are more likely to be considered

employees. Work largely done using independently obtained supplies or tools supports

an independent contractor finding.

• **Investment in facilities**. Independent contractors typically invest in and maintain their

own work facilities. In contrast, most employees rely on their employer to provide work

facilities.

• **Realization of profit or loss**. Workers who receive predetermined earnings and have little chance to realize significant profit or loss through their work generally are employees.

• **Work for multiple companies**. People who simultaneously provide services for several unrelated companies are likely to qualify as independent contractors.

### Laws

IRS-International Revenue Service state defines a statutory employee A full-time life insurance agent whose principal business activity is selling life insurance and/or annuity contracts for one life insurance company;

IRS looks at 20 factors used to evaluate right to control and the validity of independent contractor classifications include:

• **Level of instruction**. If the company directs when, where, and how work is done, this control indicates a possible employment relationship.

• **Amount of training**. Requesting workers to undergo company-provided training suggests an employment relationship since the company is directing the methods by which work is accomplished.

• **Degree of business integration**. Workers whose services are integrated into business operations or significantly affect business success are likely to be considered employees.
• **Extent of personal services**. Companies that insist on a particular person performing the work assert a degree of control that suggests an employment relationship. In contrast, independent contractors typically are free to assign work to anyone.

• **Control of assistants**. If a company hires, supervises, and pays a worker's assistants, this control indicates a possible employment relationship. If the worker retains control over hiring, supervising, and paying helpers, this arrangement suggests an independent contractor relationship.

• **Continuity of relationship**. A continuous relationship between a company and a worker indicates a possible employment relationship. However, an independent contractor arrangement can involve an ongoing relationship for multiple, sequential

projects.

• **Flexibility of schedule**. People whose hours or days of work are dictated by a company are apt to qualify as its employees.

• **Demands for full-time work**. Full-time work gives a company control over most of a person's time, which supports a finding of an employment relationship.

• **Need for on-site services**. Requiring someone to work on company premises—particularly if the work can be performed elsewhere—indicates a possible employment relationship.

• **Sequence of work**. If a company requires work to be performed in specific order or sequence, this control suggests an employment relationship.

• **Requirements for reports**. If a worker regularly must provide written or oral reports on the status of a project, this arrangement indicates a possible employment relationship.

• **Method of payment**. Hourly, weekly, or monthly pay schedules are characteristic of employment relationships, unless the payments simply are a convenient way of

distributing a lump-sum fee. Payment on commission or project completion is more characteristic of independent contractor relationships.

• **Payment of business or travel expenses**. Independent contractors typically bear the cost of travel or business expenses, and most contractors set their fees high enough to cover these costs. Direct reimbursement of travel and other business costs by a  company suggests an employment relationship.

• **Provision of tools and materials**. Workers who perform most of their work using

company-provided equipment, tools, and materials are more likely to be considered

employees. Work largely done using independently obtained supplies or tools supports

an independent contractor finding.

• **Investment in facilities**. Independent contractors typically invest in and maintain their

own work facilities. In contrast, most employees rely on their employer to provide work

facilities.

• **Realization of profit or loss**. Workers who receive predetermined earnings and have little chance to realize significant profit or loss through their work generally are employees.

• **Work for multiple companies**. People who simultaneously provide services for several unrelated companies are likely to qualify as independent contractors.

• **Availability to public**. If a worker regularly makes services available to the public, this supports an independent contractor determination.

• **Control over discharge**. A company's unilateral right to discharge a worker suggests an employment relationship. In contrast, a company's ability to terminate independent contractor relationships generally depends on contract terms.

• **Right of termination**. Most employees unilaterally can terminate their work for a company without liability. Independent contractors cannot terminate services without liability, except as allowed under their contracts.

No issue for trial exists unless the record contains "specific facts showing that there is a genuine issue for trial, "sufficient to support a jury verdict in the plaintiff's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 246-257 (1986).

Plaintiff's Counts I-VII-those arising under Title VII, the ADA, the Equal Pay Act, the Lilly Ledbetter Act, and the Colorado Anti-Discrimination act – all require Plaintiff to show she was an employee of American Income, and not an independent contractor. Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1069 (10th Cir. 1998); Birstol v. Bd., of Cnty. Comm'rs, 312 F.3d 1213, 1221 (10th Cir. 2002).

The Tenth Circuit has adopted a hybrid test for distinguishing employees from independent contractors. Oestman v. Nat'l Farmers Union Ins. Co., 9528 F. 2d 303, 305 (10th Cir. 1992). Under the hybrid test, the focus of the court's inquiry is the employer's right to control the "means and manner of the worker's performance.

Oestman, 958 F.2d at 305.  In addition, the court considers 11 other factors (1) the kind of occupation, with reference to whether the worker usually is done under the direction of a supervisor or is done by a specialist without supervision; f(2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment whether by time or by job; (6) the manner in which the work relationship is terminated; i.e. by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) where the "employer" pays social security taxes; and (11) the intention of the  parties. Id. "In apply the hybrid test no single factor ins conclusive. Rather the court must look at the totality of the circumstances surrounding the working relationship between the parties."  Id.  The district court determines whether, no balance, the relationship is more accurately characterized as employer or  independent contractor. Id., at 306; Xie v. University of Utah, 243 Fed. App'x 367, 374 (120th Cir. 2007).

**Colorado State:**

Under Colorado 1. Industrial Claim Appeals Office v. Softrock Geological Services, Inc. et

al. (involving the classification of 1geologist) 2. Western Logistics, Inc. d/b/a Diligent Delivery Systems v. Industrial Claim Appeals Office et al. (involving the classification of 220 delivery drivers) Both cases involve whether an individual is an "independent contractor" under the Colorado Employment Security Act, C.R.S. 8-70-115. Both cases arose because of audits conducted by the Colorado Division of Employment and Training (aka Division of Unemployment Insurance). And, both cases originally found the businesses to be liable for unemployment compensation premiums due. In other words, for the most part, the Division (the auditor, the Hearing Officer(s) and/or the Industrial Claim Appeals Office) found that the workers in question should be classified as employees, and therefore, the companies owed back taxes for unemployment insurance premiums, interest, and going forward contributions. The businesses appealed.

**The Colorado Supreme Court Decisions**

In two en banc decisions (meaning all judges sat for the decisions), the Colorado Supreme Court remanded to the Colorado Court of Appeals and/or returned Softrock and Western Logistics back to the Division for proceedings consistent with the Court's holding that there is no dispositive single factor or set of factors to determine whether a worker is engaged in an independent trade or business under the Colorado Employment Security Act. Rather, the answer to the question of "independent trade" can only be resolved by applying a "totality of the circumstances" test that evaluates the particular set of circumstances and dynamics of the relationship between the worker and the company engaging the services. The factors for evaluation include, but are not limited to, the 9 factors set forth in the statute: [Whether the employer:] 1. Require[s] the individual to work exclusively for the

person for whom services are performed; except that the individual may choose to work exclusively for the said person for a finite period of time specified in the document; 2. Establish[es] a quality standard for the individual; except that [the employer] can provide plans and specifications regarding the work but cannot oversee the actual work or instruct the individual as to how the work will be performed; 3. Pay[s] a salary or hourly rate but rather a fixed or contract rate; 4.

Terminate[s] the work during the contract period unless the individual violates the terms of the contract or fails to produce a result that meets the specifications of the contract;

5. Provide[s] more than minimal training for the individual; 6. Provide[s] tools or benefits to the individual; except that materials and equipment may be supplied; 7. Dictate[s] the time of performance; except that a completion schedule and a range of mutually agreeable work hours may be established; 8. Pay[s] the individual personally but rather makes checks payable to the trade or business name of the individual; and 9. Combine[s] [the employer's] business operations in any way with the individual's business, but instead maintains such operations as separate and distinct. And, other factors, such as whether the worker: 1. Maintains an independent business card, listing, address, or telephone; 2. Has a financial investment such that there was a risk of suffering a loss on the project; 3. Uses his or her own equipment on the project; 4. Sets the price for performing the project; 5. Employs others to complete the project; and 6. Carries liability insurance. And still, other factors, including a "wide array of factors" related to the parties' actual relationship, rather than a "rigid check-box type inspection."

The Division has relied for many years on a strict, 2-factor analysis to determine the

classification or misclassification of a worker: (1) whether the worker is free from "control and direction" in the performance of his/her services; and (2) whether the worker is "customarily engaged in an independent trade, occupation, profession, or business related to the service performed." The "control and direction" factor remains intact. However, the "independent trade" factor used to mean that the Division would find a misclassified employee in any situation where a worker did not perform the same type of services for others as an independent contractor during the period in question. Now (as aptly and reasonably pointed out by the Colorado Supreme Court), such reliance by the Division on a single-factor test for the "independent trade" element "unfairly subjects the employer to a hindsight review of whether the putative employee engaged in other work during the period in question and does not consider the myriad of reasons that an independent contractor might not engage in other employment despite being free to do so."

Colorado Department of Labor and Employment use similar factors
https://www.colorado.gov/pacific/cdle/independent-contractors.

## **Conclusion**

Here, Plaintiff qualifies as a statutory employee based upon the evidence given and court filings applied to all applicable tests.  Xavier Inc. was not an independent contractor, but a statutory employee of AIL based on the evidence.  Richard Correa under all laws is a statutory employee.  Plaintiff is either directly a statutory for AIL or through AIL's statutory employment of Xavier Inc. or through AIL's statutory or employment of Richard Correa.  Plaintiff through her Complaint demonstrated that she engaged inprotection opposition and demonstrated that she suffered an adverse

employment action.

There is a dispute of act that exists and her claim does not fail as a matter of law.

Plaintiff requests a hearing on this matter.

Dated this June 14, 2017

| | Respectfully Submitted, /s/ signature |
|---|---|
| | Attorney for Plaintiff<br>s/ Maria K. Ruskiewicz, Atty. No. 43919<br>Attorney Maria Ruskiewicz<br>2851 S. Parker Rd. Ste. 410<br>Aurora, Colorado 80014<br>Tel: (303) 481-4405<br>Fax: (303) 952-6562<br>attorneymariacolorado@gmail.com |