IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:16-CV-01992-CMA-KMT</u>

Silvana Pajor Flores

    Plaintiff,

v.

American Income Life Insurance Company and
Xavier Inc.

    Defendants,

---

**<u>AMENDED</u>** Plaintiff's Response to American Income's Motion for Summary Judgement

---

**1.** COMES NOW, Plaintiff, Silvana Pajor Flores, by and through her counsel, Attorney Maria Ruskiewicz, respectfully submits this response stating there is a genuine issue of material fact and Defendant is not entitled to judgment as a matter of law:

### <u>Issue & Conclusion</u>

**2.** The issue is whether ~~or not~~ Plaintiff Silvana Pajor Flores was a statutory employee of American Income Life "AIL". Based upon either the IRS 20 factor test, the hybrid test or Colorado Labor test the Plaintiff is a statutory employee of AIL.

### <u>Facts</u>

**3.** AIL is a life insurance company headquartered in Waco, Texas, incorporated in Indiana and held by Torchmark Corporation. **(Ex. 32 Page 16 ¶11-14, Page 27 ¶14-16)**

**4.** AIL is in the business of selling life insurance (Ex. 2), underwriting and servicing insurance. It does employ salespeople, sells insurance from its home office, through direct marketing, union affiliations, credit union association affiliations and the internet. AIL markets through employees and marketed organizations. **(Ex. 32 Pages 24-25 ¶24-10; Pages 102-103 ¶21-17; Page 127 ¶10-20)**

**5.** AIL hires based on a hierarchy system starting with Presidents, Vice Presidents to Directors Then State General Agents (SGA), Regional General Agent, Master General Agent, General Agent, Supervising Agent and Agent. **(Ex. 32 Page 42 ¶5-8)** Agents are affiliated with a State General Agent within AIL defined territories to prevent competition. **(Ex. 32 Pages 177-178 ¶23-2)** AIL does direct State General Agents all the way down the hierarchy who agents may contract with. **(Ex. 32 Pages 61-62 ¶21-7)** Signed contracts are not enforced or accepted by AIL unless there is business. (**Ex. 32 Page 38 ¶ 2-11)** These documents are not disclosed to the SGA and controlled and held by AIL. **(Ex. 32 Page 41 ¶14-21; Page 42 ¶1-8)** AIL must approve from the top down employee position promotion, pay promotion and AIL confirmed that promotions are not objectively based on production. **(Ex. 32 Pages 61-62 ¶13-18)** AIL agents are employees hired through direct marketing with craigslist, monster, career builder, AIL website, Torchmark website, newspapers and other internet sites

2

as well as in person. AIL headquarters directly markets for SGAs at no cost. (Ex. 4, 21; **Ex. 32 Pages 102-103 ¶22-17)**

6. AIL directs who the SGA may contract, what the SGA may sell, where the SGA sells, how the SGA sells and with who the SGA may sell to. **(Ex. 32 Pages 61-62 ¶17-7; Pages 110-111 ¶22-20; Page 107 ¶5-14; Page 34 ¶11-25; Page 30 ¶6-11)**

7. AIL directs each SGA on who to hire and fire and promote based on internally controlled progress and persistency reports. **(Ex. 32 Pages 115 - 118 ¶3-20)**

8. AIL from the top down dictates who can be hired and fired for all positions. **(Ex. 32 Pages 61-62 ¶21-7; Pages 61-62 ¶17-7)**

9. AIL direct the SGA to review monthly AP&P reports for employee under that SGA who produce below the minimum requirements of AIL. If the report establishes a poor average then AIL directs the SGA to warn the employee and in the following quarter if there is no increase in average then to terminate that employee. **(Ex. 32 Pages 115 - 118 ¶3-20)**

10. AIL mandates training and field supervision. **(Ex. 32 Pages 139-140 ¶ 16- 7)** AIL mandates all recruits to train and agents to train recruits based upon the hierarchy. AIL mandates what AIL products agents must give and sell while controlling the time and quality through the E-APP. (**Ex. 32 Page 54 ¶7-13; Page 70 ¶ 15-22)** AIL controls field supervision and ~~filed~~ **field** training. AIL mandates, quantity of interviews, presentations and appointment sets. (Ex. 22, 2

11. AIL mandates territories with no regard to the agent's license.

12. AIL conducts mandatory meetings with its agents, such as release meetings, general agent meetings, manager meetings, non-production, low-production

meetings and individual meetings. AIL set work hours for agents, appointment hours, call hours and tracked with reports the agent's progress and persistency and quality through the E-App. AIL set minimum number of appointments an agent must schedule. (Ex. 24)

13. AIL mandated, tracked and reported when, how often and how an agent made telephone calls. AIL mandated, tracked and reported when agents recruit, conduct interviews and how many with the outcomes. AIL required agents to make a minimum number of appointments, how much time spent on appointments and mandates the next step after appointments. AIL tracks agents through its E-App. **(Ex. 32 Page 114 ¶5-20)**

14. AIL mandated annual goals, sales quotas and client lead requirements that agents were expected to meet beyond the purpose of providing performance incentives. AIL monitors its agent's production, performance, persistency, calls, leads, referrals, appointments, time spend and quality daily for monthly reports given to their SGA for mandatory review. These AIL generated reports evaluating an agent's performance determined that agents continued employment or termination. AIL directed the promotion, demotion, and termination of agents' contracts.

15. Richard Correa is an employee of AIL. AIL controls the contracts, which are not enforce until an agent makes a sale. Richard Correa is an employee for AIL with authority to hire and fire on behalf of AIL. **(Ex. 32 Page 118 ¶8-13)** AIL gives him a contract to have signed and then forward to headquarters. AIL holds the contract and does not forward its signed contract to the SGA. AIL controls the documents. AIL controls all information in the E-App. **Ex. 32 Page 118-120 ¶21-24)** AIL

disallows the SGA from reviewing reports or E-App information after 18 months of activity. AIL runs weekly reports on SGA agents, directs those reports to the SGA to discuss with the agent. If the agent during its second quarter does not meet minimum requirements, AIL directs SGA to terminate that agent. (Ex. 3)

16. AIL mandates approval requirements on all promotions under the SGA and with the SGA. AIL directly markets recruits from their headquarters then mandates agents within the designated territory to recruit.

17. SGA are given lead packets. AIL dictates how the leads are utilized, dispersed and always owns the leads. AIL directly markets for leads through union affiliation and credit union associations. **(Ex. 32 Page 15-16 ¶17-2)**

18. AIL has no contract with Xavier Inc. AIL has no contract with Richard Correa Agency. Plaintiff has no contract with Xavier Inc. Plaintiff has no contract with Richard Correa Agency. Xavier Inc. is not registered with Colorado's department of regulation as an insurance agency. Richard Correa Agency is not registered with Colorado's department of regulation as an insurance agency. AIL only contracts with individuals and no companies or agencies. Richard Correa states that AIL is dba Xavier Inc. Tax document established that Richard Correa owns a percentage, the other percentage owner was not disclosed. (Ex. 18)

19. AIL directs who SGA Richard Correa affiliates with. AL directs all SGA training of agents and provide mandatory scripts. **(Ex. 32 Pages 95 ¶4-6**) AIL directs SGAs and down the hierarchy to obtain, promote and demote an agent in the hierarchy. AIL controls all SGA solicitation of business. AIL directs SGA interactions with agents within the hierarchy and work schedules and dress code.

20. SGAs do not license independent agencies separate of AIL. **(Ex. 32 Page 11 ¶16-24)**

Not one of AIL's SGAs have a licensed agency, nor will the contract signed between AIL and Richard Correa allow it. AIL verified that no contract is with brokers or anyone but individuals. State laws require AIL to have contractual relationships with all agencies and companies that sell its products. AIL now confirms intentional breaking of the administrative regulation laws and state laws.

21. Plaintiff has personal knowledge of the contractual relationship upon review of the contract and interactions between Correa and AIL. Plaintiff does have personal knowledge of the interactions with agents in the hierarchy and AIL.

22. AIL dictates when, where and how often an employee makes telephone calls.

23. AIL mandatory scripts include but are not limited to: Child Safe scripts, Referral scripts, POS scripts, Lapse scripts, Union scripts, Discount Card scripts. (Ex. 25-28; **Ex.33 Pages 95-65 ¶4-6**))

24. SGAs are given monthly reports from AIL. These reports are called progress and persistency and Qlik View reports. (Ex. 29)

25. AIL directed Plaintiff to study for her license at the AIL office in Aurora.

26. AIL was involved in Plaintiff's training. (Ex. 23)

27. AIL provided Plaintiff with a list of prospective clients to call, and kept all prospective clients after employment, even if obtained through Plaintiff's personal efforts.

28. AIL mandated what types of products to sell, give and required Plaintiff to sell a AIL product from the hierarchy and AIL's e-app. Plaintiff was required to sell insurance products exclusively for AIL. Alternatively, AIL is a captive company and therefore exclusive again

29. AIL mandated Plaintiff on who to call, and when to call. AIL mandated where to meet clients.

30. Plaintiff was required to be at the AIL office a certain number of hours per week and solicit business a certain number of hours per week that was tracked on AIL's e-app. (Ex. 24)

31. Plaintiff did punch in and out on the e-app by completing appointments, closings and the likes that are time tracked with reports by AIL. The e-app and Qlik view reports provided by AIL required the Plaintiff to notify AIL the timing of appointments and identified who she must see.

32. AIL did report based on performance evaluations on Plaintiff that was day, hour, minute and second tracked by AIL e-app.

33. Plaintiff studies for a basic producer license with no specialized training.

34. AIL provided expenses for her business such as location, computers, printers, tables, work space, training, leads and travel expenses. (Ex. 7, 15, 17, 20)

35. AIL supplied phone, fax, materials, secretary, marketing for leads and recruits with mandated approval on business cards, email addresses and all written items with AIL. Plaintiff rented an apartment but not an office.  (Ex. 15)

36. Plaintiff was not paid strictly by commission. (Ex. 19; **Ex. 32 Page 18 ¶23-24, Pages 17-18 ¶19-9, Page 139 ¶2-6; Page 160 ¶4-9)**

37. AIL controlled hired recruits by taking recruits out of the hierarchy. The recruits after being trained and hired by Plaintiff were assigned to other AIL employees.

38. Plaintiff's ability to earn commissions was dependent upon the financial viability success or profit of AIL and there was a cap on the amount of commissions

Plaintiff could earn because AIL had to approve promotion and increase in commissions not just based on production. **(Ex. 32 Page 189 ¶11-15)**

**39.** AIL permitted the Plaintiff to participate in the optional employee group "union", health insurance plan, employee stock options, group life benefits, death benefits, vacations, gifts and other employee benefits by AIL. (Ex. 5-6, 8-14 & 16)

**40.** Plaintiff was hired under the contracted guise of independent contractor for AIL, but the daily circumstances since day one established a statutory employee relationship from September 7, 2013 until constructive termination on March 11, 2015.

## Laws

**41.** IRS-International Revenue Service state defines a statutory employee A full-time life insurance agent whose principal business activity is selling life insurance and/or annuity contracts for one life insurance company;

**42.** IRS looks at 20 factors used to evaluate right to control and the validity of independent contractor classifications include:

**43. Level of instruction**. If the company directs when, where, and how work is done, this control indicates a possible employment relationship.

**44. Amount of training**. Requesting workers to undergo company-provided training suggests an employment relationship since the company is directing the methods by which work is accomplished.

**45. Degree of business integration**. Workers whose services are integrated into

business operations or significantly affect business success are likely to be considered employees.

46. **Extent of personal services**. Companies that insist on a particular person performing the work assert a degree of control that suggests an employment relationship. In contrast, independent contractors typically are free to assign work to anyone.

47. **Control of assistants**. If a company hires, supervises, and pays a worker's assistants, this control indicates a possible employment relationship. If the worker retains control over hiring, supervising, and paying helpers, this arrangement suggests an independent contractor relationship.

48. **Continuity of relationship**. A continuous relationship between a company and a worker indicates a possible employment relationship. However, an independent contractor arrangement can involve an ongoing relationship for multiple, sequential projects.

49. **Flexibility of schedule**. People whose hours or days of work are dictated by a company are apt to qualify as its employees.

50. **Demands for full-time work**. Full-time work gives a company control over most of a person's time, which supports a finding of an employment relationship.

51. **Need for on-site services**. Requiring someone to work on company premises—particularly if the work can be performed elsewhere—indicates a possible employment relationship.

52. **Sequence of work**. If a company requires work to be performed in specific order or sequence, this control suggests an employment relationship.

53. **Requirements for reports**. If a worker regularly must provide written or oral

reports on the status of a project, this arrangement indicates a possible employment relationship.

54. **Method of payment**. Hourly, weekly, or monthly pay schedules are characteristic of employment relationships, unless the payments simply are a convenient way of distributing a lump-sum fee. Payment on commission or project completion is more characteristic of independent contractor relationships.

55. **Payment of business or travel expenses**. Independent contractors typically bear the cost of travel or business expenses, and most contractors set their fees high enough to cover these costs. Direct reimbursement of travel and other business costs by a company suggests an employment relationship.

56. **Provision of tools and materials**. Workers who perform most of their work using company-provided equipment, tools, and materials are more likely to be considered employees. Work largely done using independently obtained supplies or tools supports an independent contractor finding.

57. **Investment in facilities**. Independent contractors typically invest in and maintain their own work facilities. In contrast, most employees rely on their employer to provide work facilities.

58. **Realization of profit or loss**. Workers who receive predetermined earnings and have little chance to realize significant profit or loss through their work generally are employees.

59. **Work for multiple companies**. People who simultaneously provide services for several unrelated companies are likely to qualify as independent contractors.

60. **Availability to public**. If a worker regularly makes services available to the public, this supports an independent contractor determination.

61. **Control over discharge**. A company's unilateral right to discharge a worker suggests an employment relationship. In contrast, a company's ability to terminate independent contractor relationships generally depends on contract terms.

62. **Right of termination**. Most employees unilaterally can terminate their work for a company without liability. Independent contractors cannot terminate services without liability, except as allowed under their contracts.

63. No issue for trial exists unless the record contains "specific facts showing that there is a genuine issue for trial, "sufficient to support a jury verdict in the plaintiff's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 246-257 (1986).

64. Plaintiff's Counts I-VII-those arising under Title VII, the ADA, the Equal Pay Act, the Lilly Ledbetter Act, and the Colorado Anti-Discrimination act – all require Plaintiff to show she was an employee of American Income, and not an independent contractor.  Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1069 (10th Cir. 1998); Birstol v. Bd., of Cnty. Comm'rs, 312 F.3d 1213, 1221 (10th Cir. 2002).

65. The Tenth Circuit has adopted a hybrid test for distinguishing employees from independent contractors. Oestman v. Nat'l Farmers Union Ins. Co., 9528 F. 2d 303, 305 (10th Cir. 1992). Under the hybrid test, the main focus of the court's inquiry is the employer's right to control the "means and manner of the worker's performance.

66. Oestman, 958 F.2d at 305.  In addition, the court considers 11 other factors (1)

the kind of occupation, with reference to whether the worker usually is done under the direction of a supervisor or is done by a specialist without supervision; f(2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment whether by time or by job; (6) the manner in which the work relationship is terminated; i.e. by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) where the "employer" pays social security taxes; and (11) the intention of the parties. Id. "In apply the hybrid test no single factor ins conclusive. Rather the court must look at the totality of the circumstances surrounding the working relationship between the parties." Id.  The district court determines whether, no balance, the relationship is more accurately characterized as employer or independent contractor.  Id., at 306; Xie v. University of Utah, 243 Fed. App'x 367, 374 (120th Cir. 2007).

**67.** Shaw v. Am. Income Life Ins. Co., No. is taken out of context.  The facts are a prior sales agent signed an affidavit with unknown information to him or lack of personal knowledge.  During a deposition when Plaintiff was asked about his affidavit his answers entailed "I don't really know".   This case is not applicable.

**~~Colorado State:~~**

**68.** Under Colorado 1. Industrial Claim Appeals Office v. Softrock Geological Services, Inc. et al. (involving the classification of 1geologist) 2. Western Logistics, Inc. d/b/a Diligent Delivery Systems v. Industrial Claim Appeals Office et al. (involving the classification of 220 delivery drivers) Both cases involve whether an individual is an "independent contractor" under the Colorado Employment Security Act, C.R.S. 8-70-115. Both cases arose as a result of audits conducted by the Colorado Division of Employment and Training (aka Division of Unemployment Insurance). And, both cases originally found the businesses to be liable for unemployment compensation premiums due. In other words, for the most part, the Division (the auditor, the Hearing Officer(s) and/or the Industrial Claim Appeals Office) found that the workers in question should be classified as employees, and therefore, the companies owed back taxes for unemployment insurance premiums, interest, and going forward contributions. The businesses appealed.

**69. The Colorado Supreme Court Decisions**

In two en banc decisions (meaning all judges sat for the decisions), the Colorado Supreme Court remanded to the Colorado Court of Appeals and/or returned Softrock and Western Logistics back to the Division for proceedings consistent with the Court's holding that there is no dispositive single factor or set of factors to determine whether a worker is engaged in an independent trade or business under the Colorado Employment Security Act. Rather, the answer to the question of "independent trade" can only be resolved by applying a "totality of the circumstances" test that evaluates the particular set of circumstances and

dynamics of the relationship between the worker and the company engaging the services. The factors for evaluation include, but are not limited to, the 9 factors set forth in the statute: [Whether the employer:] 1. Require[s] the individual to work exclusively for the person for whom services are performed; except that the individual may choose to work exclusively for the said person for a finite period of time specified in the document; 2. Establish[es] a quality standard for the individual; except that [the employer] can provide plans and specifications regarding the work but cannot oversee the actual work or instruct the individual as to how the work will be performed; 3. Pay[s] a salary or hourly rate but rather a fixed or contract rate; 4.Terminate[s] the work during the contract period unless the individual violates the terms of the contract or fails to produce a result that meets the specifications of the contract; 5.Provide[s] more than minimal training for the individual; 6. Provide[s] tools or benefits to the individual; except that materials and equipment may be supplied; 7. Dictate[s] the time of performance; except that a completion schedule and a range of mutually agreeable work hours may be established; 8. Pay[s] the individual personally but rather makes checks payable to the trade or business name of the individual; and 9. Combine[s] [the employer's] business operations in any way with the individual's business, but instead maintains such operations as separate and distinct. And, other factors, such as whether the worker: 1. Maintains an independent business card, listing, address, or telephone; 2. Has a financial investment such that there was a risk of suffering a loss on the project; 3. Uses his or her own equipment on the project; 4. Sets the price for performing the project; 5. Employs others to complete the project; and 6.Carries liability insurance. And still, other factors, including a "wide

array of factors" related to the parties' actual relationship, rather than a "rigid check-box type inspection."

**70.** The Division has relied for many years on a strict, 2-factor analysis to determine the classification or misclassification of a worker: (1) whether the worker is free from "control and direction" in the performance of his/her services; and (2) whether the worker is "customarily engaged in an independent trade, occupation, profession, or business related to the service performed." The "control and direction" factor remains intact. However, the "independent trade" factor used to mean that the Division would find a misclassified employee in any situation where a worker did not perform the same type of services for others as an independent contractor during the period in question. Now (as aptly and reasonably pointed out by the Colorado Supreme Court), such reliance by the Division on a single-factor test for the "independent trade" element "unfairly subjects the employer to a hindsight review of whether the putative employee engaged in other work during the period in question and does not consider the myriad of reasons that an independent contractor might not engage in other employment despite being free to do so."

**71.** Colorado Department of Labor and Employment use similar factors https://www.colorado.gov/pacific/cdle/independent-contractors.

## Conclusion

**72.** Here, Plaintiff qualifies as a statutory employee based upon the evidence given and court filings applied to all applicable tests.

Dated this June 12, 2017

|  | Respectfully Submitted,<br><br>/s/ signature |
|--|--|
|  | Attorney for Plaintiff<br>s/ Maria K. Ruskiewicz, Atty. No. 43919<br>Attorney Maria Ruskiewicz<br>2851 S. Parker Rd. Ste. 410<br>Aurora, Colorado 80014<br>Tel: (303) 481-4405<br>Fax: (303) 952-6562<br>attorneymariacolorado@gmail.com |